Filed 5/3/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAMES DAVIS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF FRESNO et al.,<br><br>Defendants and Respondents. | F073151<br><br>(Super. Ct. No. 14CECG01490)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Carlos A. Cabrera, Judge.

Law Offices of Jacob M. Weisberg and Jason M. Weisberg for Plaintiff and Appellant.

Daniel C. Cederborg, County Counsel, Catherine E. Basham, Deputy County Counsel, for Defendants and Respondents.

-ooOoo-

Plaintiff James Davis was dismissed from his employment as a supervising juvenile correctional officer based on findings of insubordination, discourteous treatment of a subordinate, wrongfully assuming supervisorial duties over his wife despite several

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and IV. of the Discussion.

admonitions to the contrary, exaggerating the hours he worked on multiple time cards, and other misconduct. Davis's administrative appeal of his dismissal was denied by the Civil Service Commission (Commission) of the County of Fresno (County). Davis filed a petition for a writ of administrative mandamus requesting the superior court to set aside the Commission's decision. The superior court denied the petition.

On appeal, Davis contends County violated his constitutional due process rights by failing to provide him a copy of all materials upon which the disciplinary action was based prior to his *Skelly* hearing.[1] Davis also contends County's failure to produce complete copies of reports and witness interviews conducted during the internal affairs investigation into his alleged misconduct violated the Public Safety Officers Procedural Bill of Rights Act, Government Code section 3300 et seq. (POBRA).[2]

We conclude the materials delivered prior to Davis's *Skelly* hearing satisfied the requirements of due process applicable *before* disciplinary action is imposed. In contrast, we conclude County violated Davis's right under POBRA to receive "any reports or complaints made by investigators or other persons." (§ 3303, subd. (g).) We interpret the term "any reports" to include the incident reports and interview transcripts attached to a September 2012 memorandum prepared by a special probation investigator who looked into a retaliation complaint made by another officer against Davis. Davis's alleged discourteous treatment of this officer was one of the grounds for his dismissal.

The issue of the appropriate remedy for a violation of POBRA is committed to the broad discretion of the superior court. Here, the record does not compel this court, as a matter of law, to reinstate Davis with backpay. Furthermore, there exists a wide range of remedies and we make no comment as to the merits of any of the possible remedies the

---

[1] "*Skelly* hearing" refers to the prediscplinary administrative hearing required by *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 (*Skelly*), which is described in part II.A., *post*.

[2] All unlabeled statutory references are to the Government Code.

trial court might select. Therefore, we remand this matter to the superior court and direct it to decide in the first instance the appropriate remedy.

We therefore reverse the judgment.

## FACTS

Davis worked 14 years for the California Highway Patrol before retiring due to a service-related injury. In September 2002, County hired Davis as a full-time juvenile probation officer. In June 2006, Davis was promoted to supervising juvenile correctional officer.

Davis was selected as the probation department's employee of the month in March 2004 and September 2008. In October 2008, Davis filed a complaint with the Federal Bureau of Investigation (FBI) alleging a County employee had used excessive force against a juvenile inmate. Davis informed his supervisor of his complaint to the FBI.

In February 2009, Davis was placed on paid administrative leave for alleged misconduct. Without using progressive discipline, County terminated Davis's employment in December 2009. Davis contends County placed him on leave and then fired him in retaliation for filing the complaint with the FBI. In March 2010, the Commission overturned the termination, reinstated Davis to his former position, and found a suspension of six weeks (i.e., 240 hours) without pay was appropriate. Davis asserts the Commission made its decision after hearing County's case in chief and did not wait for him to present evidence.[3]

_September 2012 Memo_

On July 5, 2012, Lonny T. Blue, juvenile correctional officer II, was informed by other officers that Davis had instructed them to write incident reports because Blue had

---

[3] In October 2010, after the Commission's decision, Davis filed a civil complaint against County, alleging retaliation related to the FBI complaint and wrongful discharge in violation of public policy. In September 2017, counsel for Davis filed a notice with the superior court stating the entire case had been settled.

brought a juvenile out for recreation on the 4th of July even though the juvenile was on a "High Security 1" contract for having a pencil in his cell. Blue then prepared an incident report dated July 5, 2012, describing what the officers had told him.

On August 3, 2012, Blue filed an internal complaint alleging Davis was retaliating against him by making it difficult for him to carry out his duties and causing him stress. Blue attached a copy of his July 5, 2012, incident report to his complaint. Blue's complaint was investigated by Glenn Johnson, special probation investigator. Johnson asked Blue for additional information supporting his allegation of retaliation and Blue responded by email dated August 21, 2012. Johnson interviewed a number of officers, including Blue and Davis. Davis was interviewed on September 7, 2012.

On September 12, 2012, Johnson completed a memorandum to Linda Penner, chief probation officer, addressing Blue's complaint of retaliation (September 2012 Memo). The September 2012 Memo was 20 pages long without its attachments and described Johnson's investigation as follows:

> "This investigation involved the review of numerous documents (each **Tabbed** for reference), and personal interviews (each transcribed and **Tabbed** for reference). Witness/interviewee statements are summarized below, however, it is suggested the full transcript be read for a complete review of the interview."

The materials placed under a particular tab might include incident reports, interview transcripts, and emails. For example, Tab 6 to the September 2012 Memo included a transcript of an interview with juvenile correctional officer Angie Marquez and an email to Marquez. It also may have included a copy of an incident report prepared by Marquez and dated July 6, 2012.

*Other Events*

On October 12, 2012, Davis forwarded to supervising juvenile correctional officer Anthony deLanda an email Davis received from program service manager Melissa Madsen. The Madsen email stated a complaint had been made against Davis and directed

4.

him not to discuss the matter with anyone other than his chosen representative. As deLanda was not Davis's representative, Davis's forwarding the email to deLanda disobeyed Madsen's directions.

On October 22, 2012, Rick Chavez (who was later promoted to chief probation officer in 2013) observed Davis arrive at the parking lot at 4:13 p.m. Davis had been scheduled to work as watch commander and should have reported at 3:48 p.m. for briefing by the outgoing watch commander. Davis's timesheet reflected that he began work at 3:48 p.m. Subsequently, a private investigator was asked to verify Davis's arrivals and departures on three Sundays when Davis was scheduled to work from 7:48 a.m. until 4:00 p.m. On those Sundays, Davis submitted false timesheets.

On December 9, 2012, while on duty and logged onto the watch commander's computer, Davis completed a timesheet for his wife, a juvenile correctional officer. Previously, Davis had been provided a copy of the department's nepotism policy, directed not to supervise his wife, and counseled that his approval of his wife's timesheets was performing a supervisory function.

_Administrative Leave and Investigation_

On December 13, 2012, County placed Davis on administrative leave and initiated an internal affairs investigation into various allegations of misconduct. In April 2013, Davis was notified by mail that additional allegations of misconduct would be included in the investigation. The violations of policy alleged included incompetency, insubordination, neglect of duty, discourteous treatment of other employees, dishonesty, and fraud.

Special probation investigator Johnson was assigned to the matter and conducted "Internal Affairs Investigation #12-0012." Davis was interviewed on May 9, 2013. Johnson also interviewed Vince Ariz, a probation services manager who acted as Davis's supervisor at the juvenile detention facility; Sandra Hearnes, a supervising juvenile correctional officer; and Chavez, who had observed Davis's late arrival to work.

5.

*Internal Affairs Report*

Johnson prepared a report for "Internal Affairs Investigation #12-0012" which was dated June 14, 2013, and sent to Penner (IA Report). The IA Report was 31 pages long without its attachments. Tab J to the IA Report was the September 2012 Memo, which addressed Blue's complaint of retaliation.

The IA Report's conclusions stated the "investigation identified numerous instances of misconduct on the part of Mr. Davis" and some occurrences violated more than one policy. To illustrate this point, the IA Report stated Davis "failed to timely review and submit [incident reports] pertaining to a specific assault on a minor who was injured and subsequently filed a Claim for Damages against the County. This misconduct can be viewed as an act of incompetency and neglect of duty." The IA Report also stated:

> "The discourteous treatment of Officer Blue is supported by Mr. Davis receiving a clandestine E mail from SJCO Herrera singling out JCO Blue; not requesting JCO Blue's input regarding activities which occurred in a Pod supervised by Mr. Davis; having peer staff write reports about Officer Blue and telling the peer officers not to discuss the matter with Officer Blue; approving a staff's time sheet for overtime in order for that staff to avoid contact with Officer Blue without Administrative approval; and the reference to 'That Kid' in describing Officer Blue."

The IA Report recommended sustaining the allegations that Davis violated (1) County personnel rules, (2) administrative policies of the probation department, and (3) a County management directive relating to the completion of timesheets.

*Notice of Disciplinary Action*

On July 26, 2013, County gave Davis a notice of intended order for disciplinary action signed by Penner, who was still acting as chief probation officer,[4] and dated July 24, 2013. The notice included an unsigned copy of a 12-page proposed order and stated

---

[4]     Penner retired as chief probation officer in March 2013.

6.

Davis could make an oral or written reply within five days. The proposed order stated the department had received numerous complaints of inappropriate conduct by Davis and several coworkers and an investigation determined Davis had (1) engaged in discourteous treatment of a subordinate employee; (2) violated directives regarding confidentiality of personnel investigations; (3) failed to review and submit reports as directed; (4) improperly engaged in supervision of his wife; and (5) failed to properly account for his working hours on his timesheets. As to the last of these allegations, paragraph 20 of the proposed order described four timesheets on which Davis falsely reported his time of arrival or departure from work.

Also on July 26, 2013, County provided Davis with a packet of information containing the IA Report and the September 2012 Memo, without attachments. County's decision to withhold the attachments is challenged in this writ proceeding as a violation of Davis's POBRA rights and his constitutional right to due process. One rationale County subsequently offered for excluding the attachments was that "[t]he attachments were not included in the packet provided to either Ms. Penner or Chief Chavez and were not considered by them in making the decision to discipline Mr. Davis."[5]

On August 14, 2013, a *Skelly* hearing was held. At the time of the *Skelly* hearing, Chavez was the chief probation officer, but he did not conduct the hearing because he witnessed some of the alleged misconduct by Davis. Penner was still employed by County and she conducted the hearing, but Chavez signed the order for disciplinary action issued after the hearing, following Penner's recommendation. The order was dated

---

[5] This post hoc rationale about documents not being considered is dubious because it relies on facts that had yet to occur when the documents were delivered to Davis. Accordingly, we are reluctant to incorporate "actual reliance by a decision maker" into the test for whether a document is a "report" for purposes of POBRA and the disclosure requirement in section 3303, subdivision (g).

August 14, 2013, and stated Davis was dismissed from his position with County effective as of that date.

*Administrative Appeal and Decision*

On August 21, 2013, Davis completed a request for appeal. He admitted some of the allegations in the order of discipline (including paragraphs 7, 18, 20 & 22) and denied other allegations on the ground they were not true. Specifically, Davis admitted (1) he had acknowledged during the May 9, 2013, interview that his actions in sharing certain information with deLanda were not consistent with the directives he had been given; (2) he had been provided with a copy of the nepotism policy, counseled that he could not supervise his wife, and told approval of her timesheet constituted a supervisory function, yet he completed a timesheet for his wife on December 9, 2012; (3) he submitted false timesheets on three Sundays when his arrival and departure was observed by a private investigator; and (4) he had previously been disciplined with a suspension for discourteous treatment of others, failing to comply with policy, and dishonesty.

On November 5, 2013, a prehearing conference was held. The parties exchanged witness lists and the department provided copies of 28 possible exhibits. The prehearing officer directed Davis to provide his exhibit list and copies within a week. Davis requested that the department be ordered to disclose materials related to the investigation of complaints made against him. On November 20, 2013, the prehearing officer issued a letter addressing Davis's request for disclosure of materials. The letter directed the department to produce some documents and concluded other documents need not be disclosed because they were irrelevant, privileged or confidential. For instance, the letter referred to "a July 7, 2012 '*IR*' and complaint filed by employee Dominguez-Marquez '*against Blue alleging use of profanity and discourteous/intimidating behavior*'" and denied Davis's request for the materials. Davis wanted the documents relating to the incident involving Blue and Marquez to impeach Blue.

8.

On November 25, 2013, Davis's counsel sent a letter to opposing counsel about the copy of the IA Report provided to Davis. The letter stated Tab J to the IA Report contained the September 2012 Memo from Johnson to Penner regarding Blue's retaliation complaint, but did not include all the documents attached to the memo and submitted to Penner. The letter stated that, because of the significance of the charges involving Blue, "Davis is entitled to have all the documents presented to Chief Penner and which are referenced in [the September 2012 Memo] at pages 1-20 as Tab 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11." The letter requested "a copy of the entire report submitted to Chief Penner by Johnson on September 12, 2012."

The next day, Davis's union representative sent a letter to County's attorney supporting Davis's request for documents. The representative's letter stated Davis's right to due process had been violated by the failure to produce the materials and, at the least, Davis should receive backpay from the date of his *Skelly* hearing (August 14, 2013) until his appeal was decided.

On November 27, 2013, Davis's counsel sent a letter to the prehearing officer and opposing counsel requesting the termination of the proceedings because of violations of Davis's *Skelly* rights and POBRA. Counsel representing County responded by refusing to provide the additional documents.

On December 3, 5, 6, and 18, 2013, hearings were held before the Commission. At the opening of the hearing, the Commission considered and denied Davis's motion to dismiss the proceeding due to the failure to produce documents.

On January 9, 2014, the Commission issued a notice of decision denying Davis's administrative appeal and confirming the probation department's termination of his employment. Davis requested written findings of fact and conclusions of law. On March 20, 2014, the Commission issued a 31-page decision stating its findings and conclusions, which became the final administrative decision on Davis's dismissal.

9.

# PROCEEDINGS

In May 2014, Davis filed a pleading consisting of a petition for writ of administrative mandamus and complaint for damages. In November 2014, Davis filed a first amended petition and complaint, which was the operative pleading for the remainder of the action.

## *Violations Alleged*

Davis alleged County's failure to produce documents violated the procedural due process rights that apply before a *Skelly* hearing and, in addition, violated the procedural due process rights that apply before the full due process hearing conducted by the Commission. In addition, Davis alleged the failure to produce the requested documents violated subdivision (g) of section 3303, which states a peace officer is entitled to "any reports and complaints."

## *Statement of Decision*

On October 8, 2015, the superior court filed an order denying petition for writ of mandate and statement of decision. The court stated Davis's *Skelly* rights had not been violated because (1) *Skelly* does not require extensive prediscipline disclosure and (2) *Skelly* addresses the hearing and disclosures required prior to the initial taking of disciplinary action and, thus, ceases to be the relevant framework once the discipline has been imposed. As to the application of the disclosure requirements in subdivision (g) of section 3303, the court concluded the terms "reports" and "complaints" suggest a more formal presentation than the raw or original source materials from which a report may be drawn and, therefore, the statute did not require disclosure of the interview transcripts and investigative reports initially attached to the September 2012 Memo.

The superior court also addressed County's alternate argument that disclosure was not required because the materials were confidential. The court acknowledged the confidentiality provision in subdivision (g) of section 3303 and stated County had not

established the confidential nature of the records at issue. Accordingly, the court stated it could not find the records were confidential.

*Judgment and Appeal*

In December 2015, the parties filed a stipulation for judgment on writ of administrative mandamus and complaint, which stated a judgment on the complaint could be entered solely on the grounds set out in the statement of decision and, if the appellate court overturned that decision regarding the denial of the writ, then the complaint for damages would be fully reinstated on remand.

In January 2016, a notice of entry of judgment or order was served and filed. Later that month, Davis filed a notice of appeal.

**DISCUSSION**

I. JUDICIAL REVIEW

A. Superior Court

The Commission's final decision on employee discipline is subject to judicial review pursuant to a petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5.) Pursuant to subdivision (b) of Code of Civil Procedure section 1094.5, the judicial review of a final administrative decision "shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion can occur three different ways: (1) "the respondent has not proceeded in the manner required by law," (2) the "decision is not supported by the findings," or (3) "the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) When a vested, fundamental right is affected by the administrative decision, the trial court must "exercise its independent judgment on the evidence" and determine whether the findings are "supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c); see *San Benito Foods v. Veneman*

11.

(1996) 50 Cal.App.4th 1889, 1895, quoting *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144.)

Davis has not referred to these statutory provisions. However, his arguments that County violated his constitutional and statutory rights by failing to provide him with all reports and complaints made against him could be categorized as a failure to provide him with a fair trial or as a claim that County "has not proceeded in the manner required by law." (Code Civ. Proc., § 1094.5, subd. (b).) Davis has not argued in this court that the findings were not supported by the weight of the evidence.

B.    Appellate Court

An appellate court reviewing a final administrative decision examines the superior court's findings of fact to determine if the findings are supported by substantial evidence. (*Beckley v. Board of Administration* (2013) 222 Cal.App.4th 691, 697.) The appellate court independently reviews the superior court's determinations of questions of law. (*Ibid.*)

II.    DUE PROCESS RIGHTS BEFORE TERMINATION[*]

A.    *Skelly* and the Disclosure of Materials

In *Skelly*, *supra*, 15 Cal.3d 194, the California Supreme Court held that permanent civil service employees have a property interest in their continued employment that is protected by the due process clause. (*Id*. at pp. 207-208.) Next, the court considered what procedural protections due process required before discipline of the employee could become effective. (*Id*. at p. 215.) The court concluded: "As a minimum, these preremoval safeguards must include notice of the proposed action, the reasons therefor, *a copy of the* charges and *materials upon which the action is based*, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (*Ibid*., italics added.) This directive as to procedural minimums gave rise to an administrative

---

[*]    See footnote, *ante,* page 1.

12.

procedure known as a *Skelly* hearing, in which an employee is given an opportunity to respond to the charges *before* removal. (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 280; see *Williams v. County of Los Angeles* (1978) 22 Cal.3d 731, 733.)

The arguments presented by the parties require us to determine what the Supreme Court meant when it stated preremoval safeguards must include a copy of the "materials upon which the [disciplinary] action is based." (*Skelly*, *supra*, 15 Cal.3d at p. 215.) This question was addressed by the Sixth District in *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264 (*Gilbert*). The court rejected the "contention that the word 'materials' as used in *Skelly* means each and every document identified in the [internal affairs investigation report] was required to be produced prior to his pretermination hearing in order to satisfy due process." (*Id.* at p. 1280.) The court noted principles of due process do not create general discovery rights. (*Ibid.*) In deciding whether the materials provided were adequate for due process purposes, the court considered whether those materials adequately provided (1) an explanation of the employer's evidence and (2) notice of the substance of the relevant supporting evidence sufficient to enable the officer to adequately respond at the pretermination stage. (*Ibid.*)

B. <u>Analysis</u>

1. *Identification of Applicable Rule of Law*

Based on *Gilbert*, we conclude the following rule of law defines the materials that must be produced. To satisfy due process, the materials provided to an employee before a *Skelly* hearing must adequately provide an explanation of the employer's evidence and notice of the substance of the evidence, which explanation and notice must be sufficient to enable the employee to adequately respond at the *Skelly* hearing. (*Gilbert*, *supra*, 130 Cal.App.4th at p. 1280.) Here, the trial court's statement of decision accurately identified this standard as the applicable rule of law.

## 2. *Identification of Materials Provided to Davis*

Based on the record before this court, the exact disclosure made to Davis before his *Skelly* hearing in August 2013 is unclear. Davis's opening brief asserts "the abridged version of the IA Report that the County produced to [Davis] included only Johnson's summaries of the witness statements and [incident reports]—not the full transcripts of the recorded witness statements or the complete copies of the [incident reports]." His opening brief restated this assertion as follows: "The County only provided [Davis] with *portions* of its Internal Affairs Investigation Report #12-0012 and #12-0012 (a) ('IA Report') prior to his *Skelly* proceeding, held on August 14, 2013. (CAR 75-127.)" This citation to pages 75 through 127 of the certified administrative record implies that these are the pages Davis received before his *Skelly* hearing.[6] Davis also contends that despite his counsel's numerous requests "for the full transcripts of the witness interviews and the [incident reports], the County adamantly refused to provide them … before the *Skelly* proceeding."

County's appellate brief concedes the attachments to the September 2012 Memo were not included in the *Skelly* packet delivered to Davis before the *Skelly* hearing. More specifically, County states the IA Report and two attachments were provided to Davis on July 26, 2013, along with a copy of the proposed disciplinary order. The attachments produced were (1) the September 2012 Memo and (2) the entire transcript of Davis's own interview in the matter addressed in the memo. Based on these statements and County's arguments about the appropriate remedy, we conclude County has acknowledged that Davis was not provided the incident reports and the transcripts of interviews of other officers that were attached to the original September 2012 Memo.

---

[6]    Pages 75 through 105 are the 31 pages of the IA Report, without attachments. Pages 106 and 107 are copies of emails sent on July 4, 2012. Pages 108 through 127 are the 20 pages of the September 2012 Memo (without attachments), which addressed Blue's retaliation complaint against Davis.

The statement of decision found the IA Report contained within it the September 2012 Memo and "[t]he memo referred to and contained certain attachments—investigative reports and transcriptions of interviews."  The statement of decision addressed the question of which documents had been provided to Davis by stating: "Though [Davis] was provided with the IA Report prior to the *Skelly* hearing, he was not provided the memo or the attachments thereto either before the *Skelly* hearing or prior to or during the course of the due process hearing conducted thereafter by the Commission." We conclude the statement as to what Davis was not provided—specifically, the September 2012 Memo—is inaccurate because it contradicts the parties' description of what was provided and the contents of the certified administrative record.  In comparison, the trial court's statement that Davis was not provided with the *attachments* to the September 2012 Memo is accurate, except for the transcript of the interview of Davis.

### 3. *Applying the Law to the Facts*

Under the applicable rule of law, the materials provided to Davis were required to adequately explain the employer's evidence and provide notice of the substance of the evidence so that Davis could adequately respond at the *Skelly* hearing.  (*Gilbert*, *supra*, 130 Cal.App.4th at p. 1280.)  The superior court determined Davis "does not and cannot argue that this standard was not met."

Davis, like all appellants, bears the burden of demonstrating the superior court erred in making this determination.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  For instance, Davis could attempt to carry this burden by demonstrating how his response at the *Skelly* hearing was hindered by the absence of the attachments to the September 2012 Memo.  Davis has not made such a demonstration or otherwise shown he was unable to adequately respond at the *Skelly* hearing.  Therefore, we conclude Davis has not shown that the 31-page IA Report and 20-page September 2012 Memo, which described the incident reports and quoted at length from witness interviews, failed to

15.

provide him with notice and an adequate explanation of the evidence relied upon by County.

Consequently, we conclude County did not violate Davis's due process rights as defined by *Skelly* and subsequent decisions when County failed to provide him with copies of the attachments to the September 2012 Memo prior to his *Skelly* hearing on August 14, 2013.

## III.  RIGHT TO REPORTS AND COMPLAINTS UNDER POBRA

### A.  Overview

#### 1.  *Statutory Protections*

Section 3303 sets forth protections that apply "[w]hen any public safety officer is under investigation and subjected to interrogation by his or her" employer in a matter that could result in discipline.  Section 3303 is primarily concerned with the conditions under which "the interrogation shall be conducted," but also imposes a few requirements that apply *after* an interrogation.  (See *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 579 (*Pasadena*) [disclosures required after the officer's interrogation].)

Here, Davis alleges County's failure to disclose information violated Government Code section 3303, subdivision (g), which provides in part:  "The complete interrogation of a public safety officer may be recorded.  If a tape recording is made of the interrogation, the public safety officer shall have access to the tape if any further proceedings are contemplated or prior to any further interrogation at a subsequent time. *The public safety officer shall be entitled* to a transcribed copy of any notes made by a stenographer or *to any reports or complaints made by investigators or other persons*, except those which are deemed by the investigating agency to be confidential."  (Italics added.)

### 2. *Supreme Court Decision*

This statutory text was discussed by the California Supreme Court when it was designated subdivision (f) of section 3303. (*Pasadena*, *supra*, 51 Cal.3d 564, 574-579.) The court stated the subdivision "defines only disclosure requirements incident to an *investigation*; it does not address the officer's entitlement to discovery in the event he or she is administratively *charged* with misconduct." (*Id.* at p. 575.) As to the timing of disclosures, the court concluded "the Legislature intended subdivision ([g]) to require law enforcement agencies to disclose reports and complaints to an officer under an internal affairs investigation only *after* the officer's interrogation." (*Id.* at p. 579.) The court noted *preinterrogation* disclosure of reports and complaints was not fundamental to the fairness of internal affairs investigations and was not supported by the statute's language or purpose. (*Ibid.*) The court expressed concern that preinterrogation disclosure might undermine public confidence in its police force and implied such a disclosure might hamper the investigation by allowing the officer being investigated to craft answers that fit or explained the evidence. (*Ibid.*) As a result, the court reversed the superior court's preliminary injunction, which prohibited the police department from interrogating an officer until it had provided him with its notes from the interview of another officer. (*Id.* at pp. 571, 580.)

In *Pasadena*, our Supreme Court noted POBRA does not define "'reports'" or "'complaints.'" (*Pasadena*, *supra*, 51 Cal.3d at p. 575.) The court did not need to decide whether the notes of the interview of another officer were covered by the statutory terms because the police department did not raise that issue. (*Ibid.*) Thus, *Pasadena* is not authority for how those statutory terms should be interpreted and applied to the officer interviews at issue in this appeal.

### 3. *Court of Appeal Decisions*

The meaning of the terms "reports" and "complaints" used in section 3303, subdivision (g) was addressed by the Fourth District in *San Diego Police Officers Assn. v.*

*City of San Diego* (2002) 98 Cal.App.4th 779 (*San Diego Police*).  Three years later, the Sixth District considered the meaning of the terms in *Gilbert, supra,* 130 Cal.App.4th 1264.**7**

In *San Diego Police*, the city argued the term "'reports'" was clear and unambiguous and referred only to the final written report of the investigator.  (*San Diego Police*, *supra*, 98 Cal.App.4th at p. 783.)  Based on this interpretation, the city concluded "notes and tape recordings that were the precursors of the final written report are beyond the scope of the statutorily mandated disclosable materials."  (*Ibid*.)  The court rejected the city's interpretation, stating the words of the statute referred "to '*any* reports or complaints,' and those words do not limit the officer's receipt of information to the *final* written report of the investigator."  (*Ibid*.)  Thus, the court was unwilling to interpret the word "any" to mean "final."  Instead, the court concluded the statutory "reference to reports and complaints provides officers with protections similar to those enjoyed by criminal defendants, including the rights to raw notes and tape-recorded statements of witnesses preserved by City."  (*Id*. at p. 785.)

In *Gilbert*, the Sixth District disagreed with the statutory interpretation adopted in *San Diego Police*.  As to the statutory text, the court stated:

> "In the context of an investigation, a 'report' would be generally defined as a detailed account or statement (Merriam–Websters Collegiate Dict. (10th ed. 2001) p. 990) and a 'complaint' would be generally defined as 'a formal allegation against a party' (*id*. at p. 234).  Both 'report' and 'complaint' suggest a more formal presentation than the raw or original source materials from which a report may be drawn.  This construction is

---

**7**    In addition to the POBRA decisions, the term "reports" has been interpreted in cases involving other statutes.  For example, when interpreting a Penal Code section making it a crime to falsely report a bomb, the Second District stated the verb "reports" was not limited to making a formal presentation, but meant "relates or tells something to someone."  (*Levin v. United Air Lines Inc.* (2008) 158 Cal.App.4th 1002, 1020.)  The court also stated "the noun 'report' also includes 'statement' or 'account.'"  (*Id*. at p. 1020, fn. 23.)

consistent with the objectives of [POBRA]." (*Gilbert*, *supra*, 130 Cal.App.4th at p. 1286.)

On the subject of investigator notes, the Sixth District stated:

"The only 'notes' to which such officer is expressly entitled under section 3303, subdivision (g), are the 'notes made by a stenographer,' who was implicitly present at the officer's interrogation.  Fair treatment of such officer does not require that all the material amassed in the course of the investigation, such as raw notes, written communications, records obtained, and interviews conducted, be provided to the officer following the officer's interrogation.  Nothing in [POBRA's] language or legislative history reveals a legislative intent to provide an officer who is the subject of an administrative internal affairs investigation with broad statutory discovery rights similar to those held by criminal defendants." (*Gilbert*, *supra*, 130 Cal.App.4th at pp. 1286-1287.)

As to reports made by persons other than the agency's investigators, the Sixth District concluded those reports were covered by the language of section 3303, subdivision (g).  (*Gilbert*, *supra*, 130 Cal.App.4th at p. 1287.)  The court stated that the mere fact a report originated from a criminal investigation, either by the employing public safety department or an outside agency, does not excuse the employing "department from making such report available where it has been expressly made part of the department's internal affairs investigation of an officer." (*Ibid*.)

B.     Issue Presented

The specific issue of statutory construction presented in this appeal has not been addressed in a published decision.  We frame that issue as follows:  Does the term "report" used in subdivision (g) of section 3303 encompass *materials attached to* an internal affairs investigation report?

We conclude that, under the circumstances presented in this case, the attachments were part of a report.  Therefore, County's failure to produce the attachments violated section 3303, subdivision (g).

C.    <u>Analysis</u>

For purposes of this discussion, the documents involved in the proceedings against Davis can be organized into three tiers.  The first two tiers consist of documents provided to Davis.  The third tier are the documents that were not provided.

### 1.    *Documents Provided: IA Report and September 2012 Memo*

The first tier is the IA Report.  In July 2013, County provided Davis of copy of the IA Report.  County does not dispute this disclosure was required by subdivision (g) of section 3303, which states the "officer shall be entitled to … any reports … made by investigators or other persons."

The second tier document is the September 2012 Memo prepared by Johnson and delivered to Penner to address Blue's complaint that Davis was retaliating against him.  County included a copy of the September 2012 Memo in the packet provided Davis in July 2013.  We conclude the September 2012 Memo qualifies as a report made by an investigator for purposes of subdivision (g) of section 3303.  First, the September 2012 Memo was prepared by Johnson, whose job title was "Special Probation Investigator."  Thus, it was "made by investigators" within the meaning of subdivision (g) of section 3303.  (See § 13 [plural includes the singular].)  Second, the contents of the September 2012 Memo demonstrate it was a report.  It described Blue's allegations and summarized Johnson's investigation, which "involved the review of numerous documents (each **Tabbed** for reference), and personal interviews (each transcribed and **Tabbed** for reference)."  In addition, the September 2012 Memo was delivered to Penner, the chief probation officer at the time.  Thus, even under the view that a "report" is a formal presentation, the September 2012 Memo qualifies as a report for purposes of section 3303, subdivision (g).  (See *Gilbert*, *supra*, 130 Cal.App.4th at p. 1286.)

### 2.    *Documents Not Provided: Attachments*

The third tier of documents consist of the attachments to the September 2012 Memo, which Johnson tabbed for reference.  Those documents included incident reports

completed by various juvenile correctional officers and transcripts of officer interviews conducted during Johnson's investigation into Blue's complaint. We conclude the attachments were a part of the "report" for purposes of section 3303, subdivision (g). First, the September 2012 Memo stated it contained summaries of the witness statements, but "suggested the full transcript be read for a complete review of the interview." Thus, the author believed the attachments were useful to a full understanding of the matter addressed. Second, providing officers with a copy of attachment to an investigative memorandum helps assure the integrity of the report because the officer will be able to check the source documents to determine if they are accurately described in the memorandum. Thus, interpreting the term "report" to include attachments furthers POBRA's purpose of promoting stability, integrity and public confidence in law enforcement. (See § 3301 [legislative findings and declarations]; *Pasadena*, *supra*, 51 Cal.3d at p. 572 [POBRA's procedural protections allow internal affairs investigations to be conducted fairly, which helps maintain the police force's efficiency and integrity].)

One way to analyze what documents are included in a "report" is to ask which system of disclosure would generate the most public confidence—a system where attachments are withheld from officers or a system where attachments are provided to officers. The answer is obvious. Withholding information would diminish public confidence, while providing the attachments would promote confidence. (See *Common Cause v. Stirling* (1981) 119 Cal.App.3d 658, 664 [sunlight is said to be the best of disinfectants].) Therefore, we conclude the attachments were part of a report that County was required to provide under section 3303, subdivision (g). Accordingly, we need not address the split of authority and decide whether the interview transcripts and incident reports would have been covered by the statute if they had not been attached to the September 2012 Memo.

21.

D.      Constitutional Question

Davis contends he has raised questions about whether the constitutional due process requirements were satisfied both before and after his *Skelly* hearing. Davis argues the failure to provide complete documentation, besides violating POBRA, also violated the constitutional requirements that apply to post-termination evidentiary hearings, like the one conducted by the Commission.

Having concluded POBRA was violated, we do not reach the constitutional questions, except to conclude that compliance with POBRA's procedural protections relating to document disclosure satisfies the requirements of procedural due process that applied prior to the Commission's hearing. (See generally, *Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.* (2008) 44 Cal.4th 528, 538 [common practice to construe statutes, when reasonable, to avoid constitutional questions].)

E.      Remedy

1.      *Contentions*

The parties dispute how to remedy the violation of POBRA's procedural protections. Davis argues that reinstatement with backpay is the appropriate remedy. In contrast, County argues that (1) exclusion of the remainder of the September 2012 Memo would be the appropriate remedy and (2) reinstatement with backpay is not appropriate if the employer can show the same result would have occurred in the absence of the statutory violation. County further argues that sending the matter back to the Commission for another hearing is not necessary because no change in outcome would result and Davis had a full and fair opportunity at the previous hearing.

2.      *Statutory Provisions*

Section 3309.5, subdivision (a) states "[i]t shall be unlawful for any public safety department to deny or refuse any public safety officer the rights and protections guaranteed to him or her by [POBRA]." Subdivision (c) of this statute provides that the superior court shall have initial jurisdiction over any proceeding brought by an officer for

22.

alleged violations of POBRA. The remedies for a POBRA violation are addressed in subdivisions (d) and (e) of section 3309.5.

> "In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a temporary restraining order, preliminary injunction, or permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer." (§ 3309.5, subd. (d)(1).)

This provision grants superior courts broad discretion to fashion appropriate equitable remedies to redress violations of POBRA and to deter future ones. (*Williams v. City of Los Angeles* (1988) 47 Cal.3d 195, 203.) By enacting this provision, the Legislature determined the task of formulating a remedy was best left to the courts on a case-by-case basis. (*Ibid*.)

The remedy of damages is addressed in subdivision (e) of section 3309.5. It provides for the imposition of a $25,000 civil penalty if the department maliciously violated POBRA with the intent to injure the officer. In addition, it states: "If the court so finds, and there is sufficient evidence to establish actual damages suffered by the officer whose right or protection was denied, the public safety department shall also be liable for the amount of the actual damages." (§ 3309.5, subd. (e).)

### 3. Remand

The information available to this court does not include the documents that were withheld from Davis in violation of POBRA. Consequently, we have not been able to assess the impact their disclosure might have had on the administrative proceedings. As a result, we conclude the documents should be provided to Davis and his counsel *before* they present arguments to the trial court about "appropriate injunctive or other extraordinary relief to remedy the violation" of POBRA. (§ 3309.5, subd. (d)(1).) Once the documents have been provided to Davis and the parties have been given an

23.

opportunity to present arguments about their impact, then the trial court will have information relevant to exercising the broad discretion granted by POBRA and determining what injunctive or other extraordinary relief, if any, is "appropriate" to remedy County's POBRA violation and deter future violations.

County has argued that reinstatement, backpay and a rehearing before the Commission can be eliminated as appropriate relief under POBRA because the failure to disclose information related to Blue's retaliation complaint against Davis did not taint the Commission's decision to terminate Davis's employment for just cause. Counsel for Davis disagreed with this assessment, arguing the Commission heard testimony about the Blue matter and that testimony may have poisoned the well. Counsel for Davis argues he was limited in his ability to cross-examine the witnesses who testified because he did not have the attachments, which included transcripts of Johnson's personal interviews of the witnesses.

County's argument is based in part on the Commission's express findings that (1) Davis's "acts of insubordination and/or incompetence … are all individually and separately sufficient to warrant termination" and (2) Davis's "dishonesty in the submission of multiple time card entries … is solely by itself sufficient to warrant his termination." In response, Davis argues that, despite the wording of these findings, the Commission still could have been prejudiced by the testimony about the Blue matter. The arguments presented by the parties strengthen our conclusion that the question of appropriate remedy, which includes whether the matter should be remanded to the Commission, are best left for the trial court to decide after the withheld documents have been delivered to Davis and his attorney.

Furthermore, regardless of how this court dealt with the question of mandamus relief, a remand would be necessary to determine whether Davis is entitled to any relief

24.

under his complaint, which requests damages, civil penalties and attorney fees.[8]  The fact that the trial court is in the best position to coordinate the relief granted in any writ of mandate, with the remedies awarded under the complaint, provides further support for our decision to remand the question of mandamus relief for further proceedings.  (See Code Civ. Proc., §§ 43, 906 [discretionary authority of reviewing court in formulating relief]; cf. *Williams v. City of Los Angeles, supra,* 47 Cal.3d at p. 205, fn. 5 [superior court abused discretion in ordering officer reinstated and precluding all use of the statements obtained in violation of POBRA; issue of entitlement to backpay for violation of *Skelly* rights left to be resolved on remand].)

IV.    IMPARTIALITY OF INITIAL DECISION MAKER[*]

A.    Background

County's chief probation officer's responsibilities include acting as the final decision maker in disciplinary actions of department employees.  Penner was employed as chief probation officer for eight years ending in March 2013.  Chavez began as chief probation officer in approximately August 2013, after serving almost two years as the division director of administrative services.

Penner acted as the hearing officer at Davis's August 2013 *Skelly* hearing.  During the evidentiary hearing conducted by the Commission, Penner testified she was a County employee at that time and was serving as interim chief probation officer.  Penner also testified Chavez had been appointed as the new chief probation officer and there was a short period of overlap.

Although Penner acted as the hearing officer, the order for disciplinary action dated August 14, 2013, was signed by Chavez in his capacity as chief probation officer.

---

**8**    The parties stipulated that the complaint would be reinstated if the trial court's denial of the petition for writ of administrative mandamus was overturned.

\*    See footnote, *ante*, page 1.

25.

Penner testified she provided a recommendation to Chavez.  Chavez testified he accepted that recommendation when he signed the order.

B.     Contentions of the Parties

*1.     Davis's Contentions*

Davis's opening brief frames the issue of Chavez's involvement in the August 14, 2013, decision to terminate his employment as whether Chavez violated his "right to due process by failing to recuse himself from making the decision to terminate [Davis], as he was the only percipient witness to charges contained in the Order for Disciplinary Action, was interviewed with regard to his observations, and thereafter called to testify as a witness at the appeal hearing before the Commission."  Davis notes that Chavez recused himself from acting as the hearing officer at Davis's *Skelly* hearing and argues Chavez also should have recused himself from making the final dismissal order.  In effect, Davis argues due process requires (1) an impartial hearing officer conduct the *Skelly* hearing and (2) an impartial decision maker decide whether dismissal is appropriate.

*2.     County's Contentions*

County contends Davis did not claim that there was anything improper about Chavez signing the disciplinary order and, during the superior court proceedings, did not present any argument or authority in support of such a claim.  Thus, County contends Davis should not be allowed to raise this issue for the first time on appeal.

Alternatively, County contends the claim does not support a reversal of the trial court's decision.  First, County asserts Davis has not claimed the entity that made the final administrative decision—the Commission—was not impartial and contends the Commission's impartiality makes up for any bias that might have tainted the decision maker at the pretermination stage.  County quotes *Walker v. City of Berkeley* (9th Cir. 1991) 951 F.2d 182 (*Walker*), for the following principle:  "[T]he failure to provide an impartial decisionmaker at the pretermination stage, of itself, does not create liability, so

26.

long as the decisionmaker at the post-termination hearing is impartial." (*Id*. at p. 184.) Second, County argues Chavez was impartial as his involvement as a witness—he saw Davis leave work early on one occasion—was minimal and Chavez's testimony about the events on that day was not contested by Davis. Thus, Chavez was not required to resolve a factual dispute that involved assessing his own credibility as a witness.

### 3. *Davis's Reply Brief*

Davis's reply brief did not respond to County's arguments that (1) he failed to raise the question of Chavez's impartiality in the superior court proceedings or (2) Chavez was impartial because his involvement as a witness was insubstantial. (See *Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1238 [tactical reasons for intentionally omitting arguments from brief].)

### C. Merits of the Claim

We conclude Davis has not established the merits of his claim that his due process rights were violated when Chavez failed to recuse himself from making the decision to terminate Davis's employment. As the appellant, Davis has the burden of affirmatively demonstrating error. (See *Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.) On appeal, Davis has presented no argument or citation to authority explaining why his situation is not governed by the principle set forth in *Walker* and quoted in County's respondent's brief. In *Walker*, before setting forth its conclusion that an impartial decision maker is not required at the pretermination stage if an impartial decision maker is provided at the post-termination hearing, the Ninth Circuit stated:

> "Since [1985], other circuits have not required that the decisionmaker in a pretermination hearing be impartial, so long as due process is provided in a post-termination hearing. *See*, *e.g.*, *Duchesne v. Williams*, 849 F.2d 1004 (6th Cir.1988) (no due process violation where allegedly biased city manager held pretermination hearing for chief building inspector, but Michigan law provided for a full post-termination hearing), *cert. denied*, 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989); *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir.1987) (no due process violation where

decisionmakers at pretermination stage were allegedly biased, but plaintiff was offered a post-termination hearing before a different body).” (*Walker*, *supra*, 951 F.2d at pp. 183-184.)

This view of the requirements of federal due process has been widely adopted. (See *McDaniels v. Flick* (3d Cir. 1995) 59 F.3d 446, 459-460 [overview of case law].) We conclude the same requirements also satisfy the requirements of our state constitution. As Davis has not shown the Commission was biased, we conclude the hearing before the Commission cured any impartiality that might have existed at the pretermination stage. As a result, we do not reach County’s other arguments.

## DISPOSITION

The judgment is reversed. The superior court is directed to vacate its order denying the writ petition and issue an order directing County to provide Davis with a copy of the documents attached to the original September 2012 Memo. After the parties have been given a reasonable opportunity to review and present arguments related to those documents, the trial court shall conduct such further proceedings as it deems necessary (1) to determine the appropriate remedy or remedies to be included in any writ of administrative mandamus issued by the court and (2) to resolve the complaint, which shall be reinstated in accordance with the parties’ stipulation.

Davis shall recover his costs on appeal.

_____
FRANSON, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
PEÑA, J.